UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

BENJAMIN MICHAEL MERRYMAN, AMY
WHITAKER MERRYMAN TRUST, and B
MERRYMAN AND A MERRYMAN 4TH
GENERATION REMAINDER TRUST,
individually and on behalf of all others
similarly situated,

Plaintiffs,

-against-                                            No. 15 Civ. 9185 (CM)

CITIGROUP, INC., CITIBANK, N.A., and
CITIGROUP GLOBAL MARKETS INC.,

Defendants.

———————————————————————— x

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

McMahon, C.J.:

Plaintiffs Benjamin Michael Merryman, Amy Whitaker Merryman Trust, and B

Merryman and A Merryman 4th Generation Remainder Trust (collectively, "Plaintiffs")

commenced this action on behalf of themselves and a putative class of similarly situated

investors. Plaintiffs allege that Defendants – Citigroup, Inc. ("Citigroup"), Citibank, N.A.

("Citibank"), and Citigroup Global Markets Inc. ("CGMI") (collectively, "Citi," or

"Defendants") – breached the contracts that govern the relationships between Citi and the

holders of its American Depositary Receipts ("ADRs"). Plaintiffs allege that Defendants

converted cash distributions received from foreign issuers at one foreign exchange ("FX") rate

and then used a less favorable rate when remitting the proceeds to ADR holders, while retaining

the difference (hereinafter a "spread"), which was not contemplated by the parties' contracts.

1

Before the Court is Plaintiffs' motion for class certification pursuant to Federal Rules of Civil Procedure ("Rules") 23(a), 23(b)(2), and 23(b)(3). For the reasons set forth below, Plaintiffs' motion is GRANTED in part and DENIED in part.

## PROCEDURAL HISTORY

Plaintiffs filed a Complaint on November 20, 2015, alleging breach of contract (Count I), breach of implied covenant of good faith and fair dealing (Count II), and conversion (Count III). (Dkt. No. 1.) On December 28, 2015, Defendants moved to dismiss the Complaint (Dkt. No. 26), and on August 15, 2016, this Court dismissed Counts II and III (Dkt. No. 37). Since Citigroup and CGMI were defendants only on Counts II and III, the dismissal of these claims resulted in their dismissal from this lawsuit, leaving Citibank as the sole remaining defendant ("Defendant").

The Court also denied Defendants' motion to dismiss portions of the claims as time-barred, without prejudice to renewal at a later date, on the ground that Plaintiffs had sufficiently alleged a fraudulent concealment that might toll the statute of limitations.

Finally, the Court deferred decision on Defendants' motion to dismiss on the ground that Plaintiffs lacked class standing to represent all holders of ADRs for which Citibank was a depositary bank. The Court determined that it would reserve full consideration of the class standing issue for a motion for class certification.

Plaintiffs now move for class certification of the breach of contract claims against Citibank.

2

## BACKGROUND

*The Parties*

Plaintiff Benjamin Michael Merryman is a resident of the state of Arkansas. Mr. Merryman is Power of Attorney for Plaintiff Amy Whitaker Merryman Trust, and is a Trustee for Plaintiff B Merryman and A Merryman 4th Generation Remainder Trust.

All three Plaintiffs are former ADR holders in companies for which Citibank served as a depositary bank. Michael Merryman held five ADRs: (1) China Petroleum & Chemical; (2) ABB Ltd; 3) Taiwan Semiconductor Manufacturing Company Ltd; (4) Kyocera Ltd; and (5) Orix Corporation. Amy Whitaker Merryman Trust held two ADRs: (1) ABB Ltd; and (2) Orix Corporation. B Merryman and A Merryman 4th Generation Remainder Trust held five ADRs: (1) ABB Ltd; (2) Kyocera Ltd; (3) Orix Corporation; (4) Taiwan Semiconductor Manufacturing Company Ltd; and (5) WPP PLC.  Between the three of them, Plaintiffs held ADRs in six separate companies.

Proposed class members are current and former holders of thirty-five separate Citi-sponsored ADRs.

Defendant Citibank is a wholly owned subsidiary of Citigroup with headquarters at 701 East 60th Street North, Sioux Falls, SD 57104.

*Defendant's Alleged Breaches*

An ADR is a U.S. security that represents ownership in a foreign share. The relationship between Citibank, foreign issuers, and ADR holders is governed, in part, by the terms of the ADRs themselves and by certain deposit agreements (the "Deposit Agreements"), which annex the ADRs as exhibits and expressly incorporate their terms. Plaintiffs allege that Citibank breached the Deposit Agreements, specifically: (1) the "Cash Distributions" provision; (2) the

3

"Conversion of Foreign Currency" provision; (3) the "Fees and Charges of Depositary" provision / "Fee Schedule;" and (4) the "Standard of Care" provision.

For the sake of convenience and unless otherwise identified, citations below are to the ADR and Deposit Agreement between Citi and ABB Ltd., a Swiss company. (*See* Nirmul Decl. Ex. 2.) Parallel citations to the other Deposit Agreements are provided in a table. (*See id.* Ex. 1.)

### A. "Cash Distributions" Provision

Citibank periodically receives from foreign issuers cash distributions for shareholders (*e.g.*, dividends) in foreign currency. The terms of the ADRs themselves require Citibank to convert these payments into USD, after which it must distribute the proceeds to the ADR holders, subject to the terms of the Deposit Agreements. Citibank utilized WorldLink, a Citi-affiliated entity based in Buffalo, New York, and several other affiliated and non-affiliated entities located in the foreign issuers' home markets to convert cash distributions from foreign currency to USD. Each Deposit Agreement contains a "Cash Distributions" provision providing that when Citibank

> receives confirmation . . . of any cash dividend or other cash distribution . . . the Depositary will (i) if any amounts are received in a Foreign Currency, promptly convert or cause to be converted such cash dividend, distribution or proceeds into Dollars . . . , and (iii) **will distribute promptly the amount thus received (net of (a) applicable fees and charges of, and reasonable out-of-pocket expenses incurred by, the Depositary** and (b) taxes withheld) . . . .

(*Id.* at Citi-ADR000002141) (emphasis added). The contract explicitly states that Citibank must convert any cash dividend from foreign currency into USD immediately upon receipt of the funds from the foreign issuer, and must then remit the "amount thus received" to the ADR holder, net any applicable "fees and charges of, and reasonable out-of-pocket expenses incurred."

Plaintiffs allege that, in violation of this provision, Citibank engaged in a common practice of retaining a spread when assigning FX rates to ADR holders' cash distributions. Plaintiffs allege that Citibank would convert a distribution from foreign currency into USD at one FX rate, and then would wait until the close of the given trading day or period to retroactively assign a less favorable FX rate when calculating the amount of the distribution paid to ADR holders. Citibank allegedly retained the difference between the two rates and split it with the FX provider per a revenue sharing arrangement.

### B.   "Conversion of Foreign Currency" Provision

Each Deposit Agreement also contains a "Conversion of Foreign Currency" provision that largely mirrors the "Cash Distributions" provision, requiring that when Citi

> shall receive Foreign Currency . . . the Depositary shall promptly convert or cause to be converted . . . such foreign currency into Dollars, **and shall distribute such Dollars (net of any applicable fees, any reasonable and customary out-of-pocket expenses incurred in such conversion and any expenses incurred on behalf of the Holders** in complying with currency exchange control or other governmental requirements) . . . .

(*Id.* at Citi-ADR000002420) (emphasis added). Plaintiffs allege that Citibank's retention of spreads likewise violated this provision of the Agreement.

### C.   "Standard of Care" Provision

The "Standard of Care" provision provides that the "Company and the Depositary agree to perform their respective obligations . . . without negligence or bad faith." (*Id.* at Citi-ADR000002426.) Plaintiffs claim that Citibank breached this provision by failing to remit all money due to ADR holders and instead keeping extra-contractual sums for itself.

### D.   "Fees and Charges of Depositary" Provision / "Fee Schedule"

The Deposit Agreements specifically identify the "fees," "expenses," and "charges" that Citi is permitted to deduct in connection with cash distributions. (*Id.* at Citi-ADR000002430.) The "Fees and Charges of Depositary" provision requires ADR holders to "pay to the Depositary the Depositary's fees and related charges identified as payable by them respectively in the Fee Schedule attached." (*Id.*)

The Fee Schedule lists fees for distributions of cash dividends and cash proceeds, which range from zero to $2.00 per 100 ADSs depending on the type of cash distribution and are payable by ADR holders. (*See id.* at Citi-ADR000002464.) The Fee Schedule also lists charges, including "the expenses and charges incurred by the Depositary in the conversion of foreign currency," which are also the responsibility of ADR holders. (*Id.* at Citi-ADR000002465.)

Plaintiffs allege that Citibank breached the "Fees and Charges of Depositary" provision and the related "Fee Schedule" by creating and retaining a spread not contemplated therein.

*The Proposed Class*

Plaintiffs seek to certify two classes on behalf of themselves and all other entities who: (1) received cash distributions from thirty-five Citi-sponsored ADRs listed in Ex. 1 from January 1, 2006 to the present, inclusive (the "Class Period"), and who were damaged thereby (the "Damages Class"); and (2) currently own the thirty-five Citi-sponsored ADRs listed in Ex. 1 (the "Injunctive Class") (together with the Damages Class, the "Class"). In their motion for class certification, Plaintiffs allege that the above provisions "are identical or virtually identical" across all thirty-five ADRs listed in Ex. 1 (*see* Nirmul Decl.), and that Citibank's conduct breached these contractual obligations in the same way with respect to each ADR. (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 4.)

6

Plaintiffs owned only three of the thirty-five ADRs for which they seek to certify claims: (1) ABB Ltd; (2) Taiwan Semiconductor Manufacturing Company Ltd; and (3) WPP PLC. It is worth noting that Plaintiffs do not include in their proposed class the holders of three of the six entities in which they actually owned ADRs.

The provisions in the thirty-five Deposit Agreements, while undeniably similar, are not identical. In addition to being bound by the portions of the ABB Ltd Deposit Agreement, quoted above, Plaintiffs are party to slightly different Deposit Agreements relating to their holdings in Taiwan Semiconductor Manufacturing Company Ltd and WPP PLC Deposit Agreements. The pertinent language in the Taiwan Semiconductor Manufacturing Company Ltd Deposit Agreement reads as follows:

> 4.01. Cash Distributions. [W]henever the Custodian or the Depositary receives any cash dividend or other cash distribution by the Company in respect of any Deposited Securities, the Depositary shall . . . promptly convert or cause such dividend or distribution to be converted into U.S. dollars and shall promptly distribute such amount to the registered Holders entitled thereto . . . after deduction or upon payment of fees and expenses of the Depositary (and without liability for interest) . . . provided, however, that in the event that the Company, the Custodian, or the Depositary shall be required to withhold and does withhold . . . an amount on account of taxes or other governmental charges, the amount distributed to the Holders in respect of ADSs representing such Deposited Securities shall be reduced accordingly.

> 4.05. Conversion of Foreign Currency. Subject to any restrictions imposed by ROC law and regulations, the Depositary is required to convert or cause to be converted . . . all cash dividends and other cash distributions denominated in a currency other than U.S. dollars ("Foreign Currency"), including NT Dollars . . . and to distribute the U.S. dollar amount (net of reasonable and customary expenses incurred by the Depositary in converting such Foreign Currency) to Holders entitled thereto . . .

> 5.03. Obligations of the Depositary, the Custodian and the Bank. [T]he Depositary and its agents . . . [agree] to perform such obligations as are specifically set forth and undertaken by it in this Deposit Agreement without negligence and in good faith.

7

> 5.06. <u>Charges of Depositary</u>. The Depositary will charge any party . . . (iii) to whom a distribution of Eligible Securities pursuant to an exercise of rights or other free distributions of Eligible Securities (other than with respect to stock splits or dividends) is made, a fee of up to $0.05 for each ADS (or fraction thereof) issued or surrendered and a fee of up to $0.02 for each ADS (or fraction thereof) for any cash distribution (other than with respect to dividends) made pursuant to this Deposit Agreement . . . The Company will pay such expenses, fees of charges of the Depositary . . . as are agreed . . . except for . . . such expenses as are incurred by the Depositary in the conversion of foreign currency into U.S. dollars, and in connection with compliance with foreign exchange control regulations, which shall be payable by Holders.

(*See* Nirmul Decl. Ex. 29.)

An attached fee schedule (Ex. B) entitles Citibank to collect from the "party to whom distribution is made" $2.00 per 100 ADRs as a fee for distributions of cash proceeds. (*See id.* at Citi-ADR000005468.) Exhibit B also makes ADR holders responsible for "such expenses as are incurred by the Depositary in the conversion of foreign currency . . . and in connection with compliance with foreign exchange control regulations . . ." (*Id.*) The key verb "incurred" is used in this Deposit Agreement, just as it is in the ABB Deposit Agreement.

The WPP PLC Deposit Agreement provides:

> 4.02. Cash Distributions. Whenever the Depositary receives any cash dividend or other cash distribution on any Deposited Securities, the Depositary will . . . , promptly convert or cause to be converted such dividend or distribution into Dollars and will distribute promptly the amount thus received (net of fees of, and expenses incurred by, the Depositary) to the Holders entitled thereto . . .

> 4.07. Conversion of Foreign Currency. Whenever the Depositary or the Custodian shall receive foreign currency, by way of dividend or other distributions . . . the Depositary shall convert or cause to be converted . . . such foreign currency into dollars, and shall transfer such dollars (net of any of its reasonable and customary expenses incurred in such conversion and any expenses incurred on behalf of the Holder in complying with currency exchange control . . . to the Holders entitled thereto . . .

> 5.03. Obligations of the Depositary, the Custodian and the Bank. . . . Each of the Company and its agents . . . agrees to perform its obligations specifically set forth in this Deposit Agreement without negligence and in good faith and using reasonable judgment.
>
> 5.09. Charges of Depositary. The Company agrees to pay the expenses, fees or charges of the Depositary and the Registrar . . . other than the following items which are payable by Holders: . . . (5) such expenses as are incurred by the Depositary in the conversion of foreign currency . . . (including, without limitation, expenses incurred on behalf of Holders in connection with compliance with foreign exchange control regulations) in delivery of Deposited Securities.

(*See* Nirmul Decl. Ex. 36.)

An attached fee schedule (Ex. B) lists a fee for distribution of cash dividends or other cash distributions of "up to $2.00" per 100 ADSs held to be paid by the "person to whom distribution is made." (*See id.*) ADR holders are also responsible for "the expenses and charges *incurred* by the Depositary in the conversion of foreign currency." (*Id.*) (emphasis added).

Thirty-one of the remaining thirty-two Deposit Agreements use substantially similar language as the language used in one or more of the Deposit Agreements to which Plaintiffs were party.

The Telefonaktiebolaget LM Ericsson ("Ericsson") Deposit Agreement, however, differs from the rest. Unlike the other Deposit Agreements, none of its relevant provisions appears to require that ADR holders pay for any expenses or charges incurred in the conversion of foreign currency. Specifically, the "Conversion of Foreign Currency" provision provides, "Whenever the Depositary shall receive foreign currency, by way of dividends or other distributions . . . the Depositary shall convert or cause to be converted . . . such foreign currency into dollars, and such dollars shall be distributed to the Holders of the Receipts entitled thereto . . . ." (*Id.* at Ex. 31.) The "Expenses of the Depositary" provision in the same contract makes no mention of fees

9

or expenses (*id.*); and Exhibit B, which is entitled "Charges of the Depositary," specifically lists "Payments of Dividends Distributions or Rights Offering in respect of Shares" as a service for which there is "No charge." (*Id.*)

## Discussion

### Class Standing

As a threshold matter, the Court must resolve the question of whether Plaintiffs have standing to assert class claims with respect to ADRs in which Plaintiffs were not owners.

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. In order for federal courts to exercise jurisdiction over a case, parties must satisfy the "irreducible constitutional minimum of standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). In order to establish standing, a "plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Id.* "These requirements test whether 'a plaintiff has a sufficiently personal stake in the outcome of the suit so that the parties are adverse.'" *Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 371 (S.D.N.Y. 2016) (quoting *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008)).

Defendant contends that Plaintiffs do not have standing to represent ADR holders who received cash distributions from ADRs that Plaintiffs did not own. According to Defendant, Plaintiffs must rely on proof that is cash distribution-specific, which varies across ADRs, such that the claims relating to the ADRs that Plaintiffs owned do not implicate the same set of concerns as those of the absent class members.

10

Plaintiffs, on the other hand, urge that they do have standing to assert claims even on behalf of class members who owned ADRs that Plaintiffs did not own, because Defendant breached identical contractual duties owed to the entire class. Plaintiffs argue that they will rely on the same evidence and analysis to show that Defendant breached the Deposit Agreements and that they will prove damages for all class members through a common methodology.

Resolution of the class standing issue in this case depends on whether this case is more similar to *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012) (hereinafter "*NECA*"), or to a case decided shortly thereafter, *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of N.Y. Mellon*, 775 F.3d 154, 155 (2d Cir. 2014), *cert. denied sub nom.*, 136 S. Ct. 796 (2016) (hereinafter "*Retirement Board*"). That, as it happens, is not a decision easily made.

In *NECA*, the Second Circuit held that, in order to have "class standing," the named plaintiff must demonstrate two things: (1) that he "personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant," and (2) "that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." 693 F.3d at 162 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 267 (2003)).

The complaint in *NECA* alleged that false and misleading statements in violation of §§ 11, 12(a)(2), and (15) of the Securities Exchange Act of 1933 were made in connection with seventeen different offerings of residential mortgage backed securities (RMBS), all of which had been underwritten by defendant Goldman Sachs & Co. The named plaintiff purchased certificates in two of those seventeen offerings, but claimed that it had standing to sue on behalf of the purchasers of all seventeen offerings because they all had relied on the same shelf

11

registration statement, by which the defendant offered "securities on a continuous basis by first filing a shelf registration statement and then subsequently filing separate prospectus supplements for each [of the seventeen] offering[s]." *Id.* at 149. Each RMBS certificate represented an interest in particular pools of residential real estate loans, which various loan originators had originated. In each case, an offering was made pursuant to the shelf registration statement, supplemented by an individualized "prospectus supplement," which incorporated the shelf registration statement by reference (collectively, the "Offering Documents"). The complaint alleged that these Offering Documents contained false and misleading statements about, *inter alia*, the underwriting guidelines used by the various mortgage loan originators.

The district court granted defendants' motion to dismiss plaintiff's second amended complaint on the ground that the plaintiff lacked standing to bring claims on behalf of persons who had purchased certificates in the fifteen offerings from which plaintiff did not purchase securities. The court rejected the plaintiff's argument that, because all of the Offering Documents included nearly identical misrepresentations stemming from the same faulty shelf registration statement, their "injuries were sufficiently similar to confer standing upon the named plaintiff," irrespective of plaintiff's lack of ownership in most of the seventeen offerings. *NECA*, 693 F.3d at 154.

On appeal, the Second Circuit vacated the district court's ruling on standing and ruled that the named plaintiff had standing to represent holders of certificates in seven of the seventeen offerings – the two in which it had purchased securities, and five others in which the loan

12

originators were the same entities that had originated the loans backing the certificates in the two offerings purchased by the plaintiff.[1]

The Court of Appeals focused on who had originated the loans underlying the RMBS certificates because, to prove its claims, NECA would have to establish that "particular originators of the loans . . . had in fact abandoned [their] underwriting guidelines, rendering defendants' Offering Documents false or misleading." *Id.* at 163. As a result, the "differences in the identity of the originators backing the Certificates matter[ed] for the purposes of assessing whether those claims raise[d] the same set of concerns" as the plaintiff's claims. *Id.* The underwriting guidelines for each individual originator were alleged to be essentially the same across all of the securities backed by loans from any particular issuer, so, "proving that those guidelines were materially misleading as to loans held by one trust would tend to prove that those same guidelines were similarly misleading as to loans held by other trusts." *Retirement Board,* 775 F.3d at 155 (discussing *NECA*). But that was not true of the certificates that were backed by other originators' loans, because:

> For those offerings, each of [the] alleged injuries has the potential to be very
> different—and could turn on very different proof. More concretely, the question
> [of] whether one originator (e.g., Wells Fargo) followed the underwriting
> guidelines that defendants ascribed to it might well have had nothing to do with
> whether another originator (e.g., Washington Mutual) followed the guidelines that
> the defendants represented that it had followed. If the named plaintiff's
> investments were backed by loans originated by Wells Fargo but not Washington
> Mutual, why should the plaintiff – and not just [its] lawyers, – have any stake in

---

[1] While the *NECA* court discussed standing in the context of a motion to dismiss, its test is equally applicable when a lack of standing defense is raised in opposition to a motion for class certification. "At the class certification stage, the Second Circuit has approved of evaluating standing by relying on the pleadings and 'constru[ing] the complaint in favor of the complaining party.'" *Leber v. Citigroup 401(k) Plan Inv. Comm.*, No. 7-Civ-9329 (SHS), 2017 WL 5664850, at *6 (S.D.N.Y. Nov. 27, 2017) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006)).

proving that Washington Mutual failed to follow the underwriting guidelines described in the offering documents?

*Id.* at 162 (emphasis in original) (internal quotation marks and citations omitted). As a result, while NECA's lack of ownership was not wholly determinative of its class standing, it had standing to vindicate the interests of the holders of RMBS certificates that were originated by the same lenders whose alleged misrepresentations underlay NECA's individual claims.

In *Retirement Board*, which was decided two years after *NECA*, the Second Circuit addressed, *inter alia*, whether under *NECA*, "a named plaintiff in a putative class action has class standing to assert, on absent class members' behalf, breach-of-duty claims against the trustee of a[ ] [residential mortgage-backed securities] trust in which the named plaintiff did not invest." 775 F.3d at 155 (internal quotation marks and citations omitted). The court held that it did not.

In *Retirement Board*, the defendant, The Bank of New York Mellon ("BNYM"), acted as trustee for 530 separate residential mortgage-backed securities ("RBMS") that were created between 2004 and 2008. *Id.* at 156. The plaintiff pension funds had invested in twenty-six of the 530 trusts. The plaintiffs asserted claims, including breach of contract, on behalf of a putative class comprised of investors who had purchased certificates from any one of the 530 trusts. *Id.*

Countrywide Home Loans, Inc. ("Countrywide") was the originator of the residential mortgage loans underlying all 530 trusts at issue, and sold those loans to the trusts. *Id.* "In connection with these loan sales, Countrywide made numerous representations and warranties about the characteristics, credit quality, and underwriting of the mortgage loans." *Id.* The plaintiffs alleged that the loans sold to the trusts contained defects that were systemic and pervasive "as a result of Countrywide's failure to adhere to prudent underwriting standards, leading to widespread breaches of its representations and warranties." *Id.* The plaintiffs sought

14

to hold BNYM, as their trustee, responsible for the losses they suffered because of Countrywide's misrepresentations regarding the loans underlying the trusts. *Id.* The plaintiffs claimed "that BNYM owed to certificate holders fiduciary duties of care and loyalty, contractual duties under the trusts' governing agreements, and statutory duties," which required, among other things, the BNYM to enforce Countrywide's repurchase obligations and inform certificate holders of Countrywide's breaches. *Id.* at 157.

BNYM moved to dismiss the complaint, arguing, *inter alia*, "that [p]laintiffs lacked standing to bring claims on behalf of investors in the hundreds of trusts in which [p]laintiffs themselves did not invest." *Id.* In *NECA*, the district court granted BNYM's motion, and the plaintiffs appealed. *Id.*

In affirming the district court's dismissal, the Second Circuit held that the *Retirement Board* plaintiffs had satisfied the first part of the *NECA* test – that is, they had "suffered an actual injury as a result of BNYM's putatively illegal conduct." *Id.* at 161. More specifically, plaintiffs' injuries were "the result of BNYM's alleged failure as trustee to take appropriate action when faced with defaults on mortgage loans held by the trusts." *Id.*

However, the Circuit then elaborated on the second part of the *NECA* test for class standing – whether the named plaintiffs' claims raised "the same set of concerns" as did the claims of the absent stakeholders who held interests in the hundreds of trusts in which plaintiffs had not invested – and the court determined that they did not have standing. *Id.*

The court explained, "When [the same set of concerns] standard is satisfied, the named plaintiff's litigation incentives are sufficiently aligned with those of the absent class members that the named plaintiff may properly assert claims on their behalf." *Id.* at 161. The named plaintiff in *NECA* had the "right incentives[ ] [insofar as] the proof contemplated for all of the

15

claims would be sufficiently similar." *Id.* The Second Circuit reasoned that the breach of contract claims in *Retirement Board* were "very different" from the misrepresentation claims in *NECA*; in "contrast to *NECA,* where the defendants' alleged Securities Act violations inhered in making the *same* misstatements across multiple offerings," in *Retirement Board*, the defendant's alleged violations stemmed from its failure to affirmatively perform its duties with respect to each trust. *Id.* at 162. Proving the defendants' misconduct – first, whether Countrywide breached its obligations under the governing agreements (thereby triggering BNYM's duty to act), and second, whether BNYM subsequently violated its duties – required an examination of both Countrywide's and BNYM's conduct "loan-by-loan and trust-by-trust." *Id.* at 162-63.

Moreover, because of the nature of the claims, the court anticipated that there would be significant differences in the proof offered for each trust. *Id.* at 163. For example, whether Countrywide "was obligated to repurchase a given loan require[d] examining which loans, in which trusts, were in breach of the representations and warranties." *Id.* "And whether a loan's documentation was deficient require[d] looking at individual loans and documents." *Id.* at 162. The court "saw no way in which answering these questions for the trusts in which Plaintiffs invested will answer the same questions for the numerous trusts in which they did not invest." *Id.*

With these two holdings in mind, I turn to the class standing issue presented by this case.

As was true in both *NECA* and *Retirement Board*, Plaintiffs easily satisfy the first part of the test for class standing: Plaintiffs have personally "suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant." *NECA*, 693 F.3d at 162. Here, Plaintiffs' injuries are the result of Citibank's alleged failure to remit the "amount[s] thus received" upon receipt of cash distributions from foreign issuers, "net any applicable fees and charges of, and reasonable out-of-pocket expenses incurred." (Nirmul Decl. Ex. 2 at Citi-ADR000002141.)

16

Furthermore, in each such instance, the injury lies in Citibank's retention of exactly the same thing: the spread between the exchange rate at which Citibank converted cash distributions and the rate at which Citibank remitted those distributions to ADR holders.

Whether Defendant's alleged conduct implicates the "same set of concerns" as the conduct alleged to have caused injury to other members of the putative class presents a harder question, because this case is not wholly analogous to either *NECA* or *Retirement Board*; it lies somewhere on the spectrum between the two.

This case is similar to *NECA* in two critically important respects.

First, the rights-creating language in the three Deposit Agreements to which named Plaintiffs are party is substantially similar to the language used in all but one of the Deposit Agreements. The language in the Ericsson Agreement differs materially from the other thirty-four Deposit Agreements, in that none of its relevant provisions appears to allow Citibank to deduct any amounts from cash distributions to cover fees or expenses. I thus conclude that Plaintiffs cannot represent a claim involving the Ericsson Agreement and exclude it from further analysis.

As for the other thirty-four Deposit Agreements, any differences in language are not of such nature as to require the application of a different standard to the claims asserted on behalf of any of the thirty-four groups of ADR holders. The holders of all thirty-four ADRs had largely identical rights under their separate Agreements: the right to receive cash distributions from Citibank in the "amount thus received" by Citibank net any applicable "fees and . . . expenses incurred." Of critical importance is the fact that all thirty-four Deposit Agreements use the verb "incurred." Citibank points to no language in any of the contracts that would suggest that this phrase is to be construed differently from one contract to another. This is more closely analogous

17

to the situation involving any single loan originator in *NECA* than it is to the hundreds of trusts with different terms in *Retirement Board*.

Second, Plaintiffs allege that Citibank injured each of the stakeholders in exactly the same way: that is, in every instance it has interpreted the Deposit Agreements to permit it to deduct the spread between the exchange rate at which Citibank converted cash distributions and the rate at which Citibank remitted those distributions to ADR holders. Thus, the issue to be litigated as to each of the thirty-four contracts is identical. Indeed, it is identical to the point that, were Citibank to lose in a lawsuit that was limited to the three ADRs in which the named plaintiffs held investments, the investors in the remaining thirty-one ADRs would likely be entitled to immediate judgment on their own claims under the doctrine of offensive collateral estoppel. *See White v. Prof'l Claims Bureau, Inc.*, No. 15-cv-7187 (JFB)(ARL), 2018 WL 1036953, at \*6 (E.D.N.Y. Feb. 22, 2018).

There is no extra layer of litigation, as there was in *Retirement Board*, that would require the trier of fact to examine, on a "case-by-case" and line-by-line basis, the doubtless differing terms of the thirty-four different ADRs (and the securities underlying them) to which the Deposit Agreements relate. *Retirement Board*, 775 F.3d at 167. The only contracts at issue here are the Deposit Agreements, which are substantially similar in all material respects.

Therefore, the holders of each of the thirty-four ADRs raise precisely the same issue: was Citibank allowed to deduct a spread before remitting to them their foreign stock cash distributions.

But this case differs from *NECA* in several key ways as well. For one thing, as was the case in *Retirement Board*, the claims in this suit are contractual in nature; Plaintiffs cannot point to a single document containing a single set of misrepresentations applicable to all thirty-four

18

ADRs, in contrast to plaintiffs in *NECA*, who relied on the shelf registration for their own claims and for the claims of others as well. As a result, every one of the thirty-four Deposit Agreements will have to be introduced into evidence in order for Plaintiffs to satisfy their burden to prove that all members of the proposed class are eligible for relief. This does not present an overwhelming evidentiary burden, obviously – indeed, it is trivial compared to the burden of proving the terms of literally hundreds of thousands of separate loans that was anticipated by the *Retirement Board* court. However, it is a burden nonetheless, and one that the named Plaintiffs would not have to undertake to prove their own claims.

Next, Plaintiffs contend that Citibank had a spread retention "policy" applicable to all ADRs it administered. But, absent a concession on this point by Citibank, they will nonetheless be required to prove, not only the existence of such a policy, but the fact that Citibank adhered to that policy in each and every instance. Here, the burden on Plaintiffs is more substantial. Proving that Citibank impermissibly deducted the spread between the rate at which it actually converted a cash distribution into USD and the rate it used to determine how much cash it would actually distribute would require Plaintiffs to offer evidence of (1) the actual FX rate used when converting a particular cash distribution into dollars, and (2) the actual FX rate used when remitting the proceeds of that cash distribution to Plaintiffs. This is far more similar to the situation in *Retirement Board*, where the court anticipated that the trier of fact would have to undertake a "case-by-case" examination of each mortgage loan that was alleged to have been improperly underwritten – something the named plaintiffs had an incentive to do when their own investments were concerned, but far less incentive to do when they had no prospect of personal recovery. *Retirement Board*, 775 F.3d at 167.

19

As the Second Circuit pointed out in *Retirement Board*, "the core question is whether a plaintiff who has a personal stake in proving her own claims against the defendant has a *sufficiently personal and concrete stake* in proving other, related claims against the defendant." *Id.* at 163 (emphasis added). This question focuses on the litigation incentives of the named Plaintiffs – and "not [of] their lawyers." *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 770 (1st Cir. 2011). "The fact that it would be possible for a plaintiff to litigate a given claim plainly does not imply that she *should* be the one to litigate it." *Id.* (citing *Raines v. Byrd*, 521 U.S. 811, 818 (1997)) (emphasis added).

Proving the claims here asserted is analogous to proving the trader-based claims involving allegations of LIBOR manipulation. Courts in this circuit have routinely found that the proof in these "trader-based claims are day-to-day and episodic." *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 12 CIV. 3419 (GBD), 2017 WL 1093288, at *3 (S.D.N.Y. Mar. 10, 2017) (quoting *LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2016 WL 1558504, at *8 (S.D.N.Y. Apr. 15, 2016)). "Proof that a bank caused an artificial price one day will not determine whether it did so another day." *Id.* So too here. Proof that Defendant failed to remit all that was due to the holders of foreign-issued ADRs on one day will not prove that it did the same thing on the following day or with respect to a different ADR on the same day.

Therefore, while the question is far closer than it appears at first blush, I conclude that this case is closer to *Retirement Board* than to *NECA*, and that Plaintiffs' claims do not implicate the "same set of concerns" as those of absent class members who own ADRs that no named plaintiffs owned. Plaintiffs therefore have class standing only as to the three Citi-sponsored ADRs that they had personally owned and included in their proposed class definition: (1) ABB Ltd; (2) Taiwan Semiconductor Manufacturing Company Ltd; and (3) WPP PLC.

20

*Class Certification*

In light of the ruling just announced, I have deemed the class certification motion addressed to the smaller class that Plaintiffs are constitutionally eligible to represent.

**Legal Standard**

In order to obtain class certification pursuant to Rule 23, Plaintiffs must satisfy the four requirements of subsection 23(a) – numerosity, commonality, typicality, and adequacy of representation. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008); *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006). As the Supreme Court has observed, the Rule 23(a) prerequisites "ensure[ ] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," and "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotation marks and citations omitted). If even one of the Rule 23(a) requirements is not met, certification must be denied. *Gomez v. Lace Entm't, Inc.*, No. 15 CIV. 3326 (CM), 2017 WL 129130, at *4 (S.D.N.Y. Jan. 6, 2017).

The numerosity requirement provides that the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). "The commonality requirement is met if there is a common question of law or fact shared by the class." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010); Fed. R. Civ. P. 23(a)(2). "Typicality, by contrast, requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each

21

class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376 (internal quotation marks omitted). To be adequate, "the representative parties [must] fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *see Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010).

In addition to the Rule 23(a) factors, there is an "implied requirement that the membership of the class is identifiable and ascertainable." *Jankowski v. Castaldi*, No. 1 Civ. 0164 (SJF) (KAM), 2006 WL 118973, at *5 (E.D.N.Y. Jan. 13, 2006) (quoting *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig. (In re MTBE)*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002)); *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 337 (S.D.N.Y. 2004). A "class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir. 2017). Where any criterion is subjective, *e.g.*, state of mind, the class is not ascertainable. *See In re MTBE,* 209 F.R.D. at 337.

In addition to satisfying the Rule 23(a) prerequisites, the class proponent must satisfy at least one of the three requirements listed in subsection 23(b). *Dukes*, 564 U.S. at 345. Here, Plaintiffs seek certification of two classes under subsections 23(b)(2) and 23(b)(3), respectively.

Under subsection (b)(2), "a class action may be maintained if Rule 23(a) is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 104 (2d Cir. 2015) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011)).

Under subsection (b)(3), a claim for damages may proceed as a class if "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "As a general matter, the Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) (internal quotation marks and citation omitted).

Rule 23(b)(3) imposes a "far more demanding" inquiry into the common issues that serve as the basis for class certification. *Sykes*, 780 F.3d at 81. Nonetheless, "individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Id.* at 81 (quoting *Messner v. Northshore Uni. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012)). Moreover, "common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001).

Courts determine whether Rule 23(b)(3) certification is appropriate by considering:

(A)     the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

23

A district court must conduct a "rigorous analysis" to determine whether the requirements of Rule 23(a) have been satisfied. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). The same standard applies whether the issue is independent of or overlaps with a merits issue in the case. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006).

That said, "A motion for class certification should not . . . become a mini-trial on the merits." *Lewis Tree Serv., Inc. v. Lucent Techs.*, 211 F.R.D. 228, 231 (S.D.N.Y. 2002). "The dispositive question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Kowalski v. YellowPages.com, LLC*, No. 10 Civ. 7318 PGG, 2012 WL 1097350, at *12 (S.D.N.Y. Mar. 31, 2012) (quoting *Lucent Techs.*, 211 F.R.D. at 231). "The certifying court should not make any factual findings or merits determinations that are not necessary to the Rule 23 analysis, and any factual determinations made at the certification stage are not binding on a subsequent fact-finder, even the certifying court." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 41.

In sum, the Court's task at the Rule 23 stage is not to resolve the liability question, but to decide "whether the constituent issues that bear on [the defendants'] ultimate liability are *provable in common.*" *Myers*, 624 F.3d at 549 (emphasis added). "The Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Espinoza v. 953 Assocs. LLC*, No. 10 Civ. 5517 SAS, 2011 WL

24

5574895, at *6 (S.D.N.Y. Nov. 16, 2011) (quoting *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 361 (E.D.N.Y. 2009), *aff'd*, 568 F. App'x 78 (2d Cir. 2014)).

## A. Plaintiffs Have Satisfied the Rule 23(a) Requirements

### 1. Numerosity

"Numerosity is presumed for classes larger than forty members." *Cons. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995), *cert. denied*, 515 U.S. 1122 (1995). Here, Defendants do not dispute that Plaintiffs meet the numerosity requirement. The three ADRs at issue are publicly traded securities owned by numerous entities. Plaintiffs aver that the weekly average trading volume for each ADR at issue exceeded 100,000 shares per week, and that Citibank converted more than approximately $28 billion in cash distributions for all thirty-five ADRs during the Class Period. (*See* Nirmul Decl. Ex. 46 ("Brown Decl.") at ¶ 65.)

Plaintiffs argue that the trading volume and amount of cash distributions highly correlate to the number of ADR holders in the class, totaling in the "hundreds, if not thousands, of individuals . . ." (Pls.' Mem. in Supp. of Mot. for Class Cert. at 14.) Citibank has not suggested otherwise.

Given these amounts, the Court concludes that Plaintiffs have satisfied the numerosity requirement with respect to the narrowed set of three ADRs in the class.

### 2. Commonality

Plaintiffs also satisfy the commonality requirement of Rule 23(a).

Rule 23(a)(2) requires that there be questions of law or fact common to the class. *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001). The Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), instructed district courts that "What matters to class certification . . . is not the raising of common questions – even in droves –

but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (internal quotation marks and citation omitted). Therefore, in order for there to be a legitimate "cause to believe that all [proposed class members'] claims can productively be litigated at once," not only must those claims depend on a common contention, but that "common contention . . . must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Much of the discussion relating to standing is applicable here. I have already determined that Plaintiffs have identified a question of law and fact that is common to the claims of all class members: whether Citibank's retention of a spread when assigning FX rates to ADR holders' cash distributions breached the Deposit Agreement between it and the holders of the ADRs. "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137-38 (2d Cir. 2015) (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014)). Plaintiffs have produced more than sufficient evidence to establish by a preponderance that Defendants have (or at relevant times had) retained spreads from cash distributions, which affected the proposed class members.

### 3. Typicality

"Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Robinson v. Metro—North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001) (internal quotation marks omitted); *see* Fed. R. Civ. P. 23(a)(3).

Again, the standing discussion has considerable applicability: as has already been determined, Plaintiffs' claims and the class claims arise from the same set of events – namely, Citibank's retention of a spread from cash distributions. "Consequently, despite potential minor variations in the underlying facts of class members' claims, the class representatives' claims are typical of the claims of the class." *In re U.S. Foodservice Inc. Pricing Litig.*, No. 3:06-CV-1657 CFD, 2011 WL 6013551, at *5 (D. Conn. Nov. 29, 2011), *aff'd*, 729 F.3d 108 (2d Cir. 2013).

### 4.  Adequacy of Representation

Representation is adequate if the class representatives "will fairly and adequately protect the interests of the class." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 267 (2d Cir. 2006) (internal quotation marks omitted); Fed. R. Civ. P. 23(a)(4). In order to determine adequacy, the Court considers "whether (1) the plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (internal quotation marks omitted). Here, the class representatives' interests are not antagonistic to the claims of the rest of the class. All members of the putative class, including the class representatives, share a collective interest in recouping the funds that they allege Citibank withheld in connection with payment of cash distributions.

Defendants do not contend that Plaintiffs' attorneys are insufficient advocates or that any conflict of interests exists. Plaintiffs' attorneys at Kessler Topaz have experience litigating class actions, appear to be familiar with the applicable law, and are qualified to represent the proposed class.

The Court concludes that Plaintiffs satisfy the adequacy requirement.

27

### 5. Ascertainability

Although not expressly stated in Rule 23, courts in this District have also imposed an implied "ascertainability requirement" upon the certification process. *See, e.g., In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 44-45; *Stinson v. City of N.Y.*, 282 F.R.D. 360, 373 (S.D.N.Y. 2012); *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 140 (S.D.N.Y. 2012); *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 305 (S.D.N.Y. 2010); *Noble*, 224 F.R.D. at 337. "An identifiable class exists if its members can be ascertained by reference to objective criteria." *In re Bank of Am. Corp.*, 281 F.R.D. at 140 (quoting *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008)). "Where any criterion is subjective, *e.g.*, state of mind, the class is not ascertainable." *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 97 (S.D.N.Y. 2010) (internal quotation mark and citation omitted).

In other words, the ascertainability requirement means that "the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Stinson*, 282 F.R.D. at 373 (internal citations omitted). The standard for ascertainability "is not demanding." *Gortat*, 2010 WL 1423018, at *2. "It is designed only to prevent the certification of a class whose membership is truly indeterminable." *Id.* Further, "[c]lass members need not be ascertained prior to certification, but must be ascertainable at some point in the case." *Noble*, 224 F.R.D. at 338.

Here, the proposed class members are ascertainable. They are (1) all entities who received cash distributions from the three specific ADRs owned by Plaintiffs from January 1, 2006 to present; and (2) those who currently own those ADRs. Membership in the classes is easily ascertained by objective documentation. *See Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 136 (S.D.N.Y. 2003).

## B. Plaintiffs Are Not Entitled to Certification of a Class Under Rule 23(b)(2)

In addition to satisfying the elements under Rule 23(a), Plaintiffs must also qualify under at least one of the categories provided in Rule 23(b). *Dukes,* 564 U.S. at 345. Here, Plaintiffs seek certification of two classes, one under subsection 23(b)(2) and another under 23(b)(3).

Rule 23(b)(2) permits certification of a class when the class is seeking injunctive or declaratory relief. *See* Fed. R. Civ. P. 23(b)(2). To certify a class seeking injunctive relief under Rule 23(b)(2), Plaintiffs must show that Defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Id.*

The Court concludes that Plaintiffs lack standing to certify a Rule 23(b)(2) class.

Plaintiffs claim that Defendant's practice of retaining a spread was substantially identical across all ADRs and that, because this practice remains in effect today, the practice – unless enjoined – will cause prospective harm to *current and future ADR holders.* Even if true, however, Plaintiffs fail to produce any evidence that they fall into either of these categories. The Second Circuit has stated that, for standing "[t]o obtain *prospective* relief, such as . . . an injunction, a plaintiff must show, *inter alia,* a sufficient likelihood that he or she will again be wronged in a similar way." *Marcavage v. City of N.Y.,* 689 F.3d 98, 103 (2d Cir. 2012) (internal quotation marks and brackets omitted) (emphasis in original). "In order to have a 'personal stake in' prospective relief, a plaintiff naturally must have a likelihood of future harm—otherwise, prospective relief, which seeks to avoid future harm, would be of little benefit to the plaintiff." *Meidl v. Aetna, Inc.,* No. 15-CV-1319 (JCH), 2017 WL 1831916, at *4 (D. Conn. May 4, 2017). "In establishing a certainly impending future injury, a plaintiff cannot rely solely on past injuries; rather, the plaintiff must establish how he or she will be injured prospectively and that the injury

29

would be prevented by the equitable relief sought." *Id.*; *see also O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974). "A plaintiff's standing is considered at the time the action was commenced." *Comer v. Cisneros*, 37 F.3d 775, 791 (2d Cir. 1994).

At the time this case was filed, on November 15, 2015, Plaintiffs did not own any of their six ADRs. Neither the Complaint nor Plaintiffs' motion papers for class certification suggests that any named Plaintiff currently owns or intends to reinvest in ADRs. Even where, as here, Plaintiffs allege that Defendant had a policy or pattern in place to deduct impermissible spreads from cash distributions, "the existence of an official policy, on its own, is [in]sufficient to confer standing to sue [to enjoin future violations] on any individual who had previously been subjected to that policy." *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004). "[A] plaintiff seeking injunctive relief must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent." *Id.* "Since Plaintiffs have not demonstrated a certainly impending future injury that could be redressed by this Court, [this Court] lack[s] jurisdiction to adjudicate their claims for equitable relief." *Marcavage*, 689 F.3d at 103.

Therefore, these named Plaintiffs' motion to certify a Rule 23(b)(2) class is DENIED. But there can be no doubt that *current* ADR holders could assert classwide claims for injunctive relief.

The result is otherwise under Rule 23(b)(3). Because the named Plaintiffs are themselves entitled to damages for past breaches of contract should they prevail on the merits, they have standing to represent a 23(b)(3) class.

30

### C. Plaintiffs Are Entitled to Certification of a Class Under Rule 23(b)(3)

#### 1. Predominance

Under Rule 23(b)(3), "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *In re IndyMac Mortg.-Backed Sec. Litig.*, 286 F.R.D. 226, 235-36 (S.D.N.Y. 2012) (internal quotation marks omitted); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).

This requirement seeks, through the class action device, to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d Cir. 2012).

"While predominance requires a more rigorous showing than does commonality or typicality, it does not require a plaintiff to show that there are no individual issues." *In re IndyMac*, 286 F.R.D. at 236 (internal quotation marks omitted). Rather, in "determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class" in which case "common questions are held to predominate over individual questions." *Id.*

Moreover, while a court evaluating whether a movant has satisfied the requirements of Rule 23(b)(3) must examine both the claims and the defenses, the mere fact that a defense "may arise and . . . affect different class members differently does not compel a finding that individual issues predominate over common ones." *Noble*, 224 F.R.D. at 339. The relevant inquiry is "not whether a defense exists, but whether the common issues will predominate over the individual

31

questions raised by that defense." *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 373 (S.D.N.Y. 2007) (quoting *Noble*, 224 F.R.D. at 339).

In the present case, common questions of liability predominate over any individual inquiries.

The issues to be litigated include: (1) whether Citibank retained a spread when assigning FX rates to ADR holders' cash distributions in violation of the Deposit Agreement or, as Defendant insists, spreads are a permissible fee, expense, or charge under the terms of the Deposit Agreement; (2) whether Citibank fraudulently concealed this practice; and (3) the extent of class members' injuries, if any.

Defendant argues that, in order to prove a breach, Plaintiffs must demonstrate that Citibank deducted a spread from each cash distribution while acting through its FX providers. Defendant contends that Plaintiffs do not explain how they intend to hold Citibank responsible for the actions of its FX providers – and that, in any case, that theory would not be subject to common proof because Citibank "lacked any consistent practice with any FX Provider, much less a formal or informal policy, agreement, or direction to set prices on Cash Distributions." (Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Class Certification at 16.)

However, the Deposit Agreements obligate Citibank, not its FX providers, to convert foreign currency to USD and distribute the "amount thus received" (*i.e.*, the amount received via said conversion) to ADR holders. Citibank cannot insulate itself from liability simply by pointing the finger at its FX providers. If something Citibank's contractors did prevented Citibank from fulfilling its contractual obligations to the class, then Citibank had an obligation to get the contractors to make it right. The contractors' behavior would not excuse Citibank's non-compliance with its own contractual obligations. As the Second Circuit has explained, "The act

32

of delegation . . . does not relieve the delegant of the ultimate responsibility to see that the obligation is performed. If the delegate fails to perform, the delegant remains liable." *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 924 (2d Cir. 1977).

Moreover, without deciding the question on the merits, the Court notes that there is evidence that Citibank had a practice of deducting a spread from cash distributions. For example, Scott Pollak, Citibank's 30(b)(6) designee, testified:

> Our practice was to provide what we felt was a good rate based upon the context of the deposit agreement and the various provisions thereunder and our practice was that we felt a good rate was providing a rate that was in the range of the day at which we executed or the period at which we held the funds. That was our practice. Within that, there was a spread, which is a charge, and that was for covering the services provided with our service provider.

(Nirmul Decl. Ex. 39 ("Pollak Dep. Tr.") at 141:9-20.)

Defendant also argues, in a single conclusory footnote, that the Deposit Agreements do not contain identical provisions, which allegedly causes individual issues to predominate over common ones. (Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Class Certification at 24 n.39.) The Court has already discussed and resolved this issue (*see supra.* at p. 9-10, 17). With respect to the three ADRs in the narrowed class, there is no basis whatever to conclude that any minor linguistic differences would cause individual issues to predominate over common questions. Indeed, the Second Circuit recently affirmed certification of a contract claim when minor variations existed in the language of the disputed contracts where, as here, the underlying claim depended on "substantially similar" terms. *See In re U.S. Foodservice Inc.*, 729 F.3d at 124.

Thus, the predominance requirement is satisfied.

### 2. Superiority

The last question to be addressed under Rule 23(b)(3) is whether the "class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The Supreme Court has recognized that Rule 23(b)(3) class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).

Here, "substituting a single class action for numerous trials in a matter involving substantial common legal issues and factual issues susceptible to generalized proof will achieve significant economies of 'time, effort and expense, and promote uniformity of decision.'" *In re U.S. Foodservice Inc.*, 729 F.3d at 130-31 (citing Fed.R.Civ.P. 23 Advisory Committee's Notes); *see also In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 117-18 (S.D.N.Y. 2010). Citibank raises no argument to the contrary.[2]

### D. Plaintiffs' Motion to Preclude the Declaration of Scott Pollak is DENIED

On September 15, 2017, Plaintiffs filed a Motion to Preclude Defendant's Reliance on the Declaration of Scott Pollak. (*See* Dkt. No. 88.) On September 22, 2017, Defendant filed its opposition. (*See* Dkt. No. 94.) Plaintiffs allege that the Declaration of Scott Pollak in Support of

---

[2] The only argument that might be persuasive, though it is not made by Citibank, was alluded to above: the possibility that the doctrine of offensive collateral estoppel could be used by absent class members in individual actions were Citibank to lose in this court after having a full and fair opportunity to litigate the issue that underlies all these claims — whether it was obliged by the Deposit Agreements to remit to the ADR holders monies received from the foreign issuer using the same FX rate at which the dividends were converted into USD, or whether it could retain the spread between that amount and the amount of the dividend at some other conversion rate because that spread qualified as a "fee," a "charge," or "reasonable expense actually incurred." Presumably, Citibank does not make that argument because, in this instance, it is perfectly obvious that the cost of bringing individual actions for tiny amounts of money outweigh any expected individual recovery. This case is a modern incarnation of *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 559 (2d Cir. 1968) — an old case that remains good law today, despite the many recent limitations on class actions.

Citibank, N.A.'s Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (the "Pollak Declaration") (Dkt. No. 83) runs afoul of Rule 26(e) by untimely correcting information in documents produced by Defendants during fact discovery.

Rule 26(e) states:

(1) *In General.* A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:

(A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]

Fed. R. Civ. P. 26(e).

The Pollak Declaration corrects a small number of errors in data compilations produced by Defendant during discovery. (*See* Dkt. No. 94 at 1.) In this case, Plaintiffs sought broad discovery, requesting data on over 2,500 cash distributions paid by the more than 250 issuers of ADRs sponsored by the Depositary from 2000 to the present. Over the course of discovery, Defendant created and provided Plaintiffs with various data spreadsheets, many of which it did not keep in the ordinary course of business. (*Id.*) Plaintiffs argue that by making corrections to data via the Pollak Declaration – after fact discovery had closed on June 30, 2017 – Defendant failed to meet its burden under Rule 26(e) to timely correct "incomplete or incorrect" disclosures. (*See* Dkt. No. 88 at 4.) According to Plaintiffs, this violation of Rule 26(e) merits sanctions under Rule 37(c)(1), and, therefore, Defendant should be precluded from relying on the Pollak Declaration.

In support of this argument, Plaintiffs allege that Defendant had ample time during fact discovery to disclose the errors corrected by the Pollak Declaration and that Defendant waited

"two and a half months" to make such corrections. (*Id.* at 1, 5.) Moreover, the documents at issue in this motion had been amended by Defendant on more than one occasion during discovery when various other discrepancies were discovered. (*Id.* at 5.) However, there is no indication that the discrepancies identified during discovery were associated with the corrections made via the Pollak Declaration.

Defendant justifies the timeliness of the corrections in the Pollak Declaration by arguing that it only became aware of the errors after Plaintiffs moved for class certification on a *significantly* narrowed pool of data. (*See* Dkt. No. 94 at 7.) By the class certification stage, the data had been narrowed from approximately 250 issuers down to 35 issuers, and over 2,500 cash distributions down to 463 cash distributions. (*Id.*)

Disclosures under Rule 26(e) are continuing – they do not end when fact discovery closes. *See Ward v. Nat'l Geographic Soc'y*, No. 99 CIV. 12385(LAK), 2002 WL 27777, at *1 (S.D.N.Y. Jan 11, 2002) ("As a threshold matter, the self-executing sanction of Rule 37(c)(1) applies only when a party fails to (1) make a disclosure required by Rule 26(a), (2) make a disclosure required by Rule 26(e)(1), or (3) amend a prior response to discovery as required by Rule 26(e)(2).") Indeed, there is no indication that Defendant was sandbagging Plaintiffs or acting in bad faith by failing to disclose these corrections sooner. Defendant corrected errors via the Pollak Declaration on August 17, 2017 – forty-eight calendar days and thirty-three business days after Plaintiffs' motion for class certification – not "two and a half months" later, as Plaintiffs suggest in their brief. Given the large volume of data compiled and produced during discovery, it is entirely reasonable – and indeed, likely – that Defendant became aware of these errors only after having reviewed a smaller subset of data while preparing their expert reports.

36

Moreover, the partial granting of Plaintiffs' motion moots this application. Therefore, Plaintiffs' motion is DENIED.

### E. Plaintiffs' Motion to Preclude the Expert Testimony of G. William Brown is DENIED

After filing its opposition to Plaintiffs' motion for class certification, Citibank filed a separate motion, on November 3, 2017, to exclude the testimony of Plaintiffs' expert, G. William Brown Jr., for purposes of class certification. (*See* Dkt. No. 99.) In that motion, Citibank challenges several of Mr. Brown's assumptions and inputs regarding his damages methodology.

"Under *Daubert v. Merrell Dow Pharmaceuticals Inc.*, expert testimony is admissible if the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact or issue." *In re U.S. Foodservice Inc.*, 729 F.3d at 129 n.12 (citing 509 U.S. 579, 592 (1993)). However, "Neither the Supreme Court nor the Second Circuit has definitely decided whether the *Daubert* standard governs the admissibility of expert evidence submitted at the class certification stage." *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 148 (S.D.N.Y. 2015).

In treating such motions at the certification stage, courts in this circuit have found that while "flaws in expert testimony proffered at class certification do not warrant that testimony's exclusion by the Court as gatekeeper under *Daubert* at the threshold, those flaws may nonetheless be considered in the Rule 23 analysis undertaken by the Court as trier of fact." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 CIV. 5450 (NRB), 2018 WL 1229761, at *13 (S.D.N.Y. Feb. 28, 2018). In other words, challenges to expert testimony "must be resolved if necessary to the Rule 23 analysis." *Id.*

37

The crux of Citibank's argument is that given deficiencies in the inputs and assumptions that Mr. Brown employs, his opinions should be excluded and the Damages Class should be limited to ADRs owned by Plaintiffs. Of course, given the Court's above ruling on class certification, that argument is now moot. Moreover, "arguments that an expert's assumptions 'are unfounded go to the weight, not the admissibility, of the testimony.'" *Robinson v. Suffolk Cty. Police Dep't.*, 544 Fed. App'x. 29, 32 (2d Cir. Nov. 14, 2013) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

Accordingly, Defendant's motion is DENIED without prejudice to renewal at the merits stage.

## CONCLUSION

This constitutes the decision and order of the Court. The Clerk of the Court is directed to remove Dkt. Nos. 76, 88, and 99 from the Court's list of pending motions.

Dated: March 22, 2018

_____

Chief Judge

BY ECF TO ALL COUNSEL

38